# United States Court of Appeals
## For the First Circuit

No. 18-1759

MARK W. FLAHERTY,

Plaintiff, Appellant,

v.

ENTERGY NUCLEAR OPERATIONS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Sol J. Cohen, with whom Cohen & Sales, LLC was on brief, for
appellant.
Justin F. Keith, with whom Amanda L. Carney and Greenberg
Traurig, LLP was on brief, for appellee.

December 23, 2019

**TORRUELLA**, **Circuit Judge**. Mark Flaherty ("Flaherty") appeals the district court's order partially striking the affidavit he submitted in support of his opposition to Entergy Nuclear Operations, Inc.'s ("Entergy") motion for summary judgment and dismissing his disability discrimination and failure to accommodate claims on summary judgment. Because we find that the district court did not abuse its discretion in partially striking Flaherty's affidavit and that Flaherty failed to establish a prima facie case of disability discrimination or a claim for failure to accommodate, we affirm.

## I. Background

### A. Factual Background

#### 1. Flaherty's Employment as a Security Officer at Pilgrim

In June 2005, Flaherty was hired as a Nuclear Security Officer at Pilgrim Nuclear Power Station ("Pilgrim") in Plymouth, Massachusetts by Wackenhut Corp., Pilgrim's former security operator. In 2007, Flaherty began working directly for Entergy, the owner and operator of Pilgrim at the time.[1] U.S. Nuclear Regulatory Commission ("NRC") regulations required Entergy to maintain an armed security force to protect Pilgrim from any

---

[1] Entergy has since sold its interest in the Pilgrim power plant, which was decommissioned in August 2019. See Pilgrim Nuclear Power Station Decommissioning, http://www.pilgrimpower.com (last visited Dec. 16, 2019).

threats. Because security personnel had access to sensitive areas in the plant, such as nuclear reactors, Entergy developed the Unescorted Access Authorization Program ("UAAP") to comply with NRC regulations, which required security officers to attain and hold special clearance or unescorted access authorization. See 10 C.F.R. § 73.56.

The UAAP certification process involved an extensive background investigation, including assessments of the applicant's personal history, employment history, credit history, character and reputation, and criminal history, along with psychological and behavioral tests. 10 C.F.R. § 73.56(d)-(f). NRC regulations also required Entergy to perform ongoing annual assessments of individuals who were granted access under the UAAP. 10 C.F.R. § 73.56(i). The objective of these requirements was to "provide high assurance that the individuals . . . are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." 10 C.F.R. § 73.56(c). Further clarifying the applicable regulations, the NRC Regulatory Guide for Training and Qualification of Security Personnel at Nuclear Power Reactor Facilities states:

> [I]ndividuals should not have an established medical
> history or medical diagnosis of existing medical

-3-

conditions that could interfere with or prevent the individual from effectively performing assigned duties and responsibilities. If a medical condition exists, the individual must provide medical evidence that the condition can be controlled with medical treatment in a manner that does not adversely affect the individual's fitness-for-duty, mental alertness, physical condition, or capability to otherwise effectively perform assigned duties and responsibilities.

NRC Regulatory Guide 5.75, § 2.5 (July 2009).

To implement these applicable NRC regulations and guidelines, Entergy's "Medical Program" set a benchmark for whether an applicant was fit to perform his or her essential duties, which included "guard, armed response, armed escort and alarm station operator activities as well as . . . strenuous physical activity." Under this program, the security officers were subject to annual medical assessments to ensure that they remained qualified for UAAP certification, and these annual assessments included renewed personal and medical history questionnaires.

### 2. Flaherty's Medical History

Flaherty is a U.S. military veteran who was stationed in Iraq between 2000 and 2004. He "saw" live combat while in Iraq, as a result of which he sustained a number of medical conditions and disabilities. Accordingly, on or about July 5, 2012, Flaherty filed a claim for disability benefits with the Department of Veterans Affairs ("VA"). He claimed disability based on

radiculopathy, chronic diarrhea, lumbar strain, as well as symptoms associated with chronic fatigue syndrome ("CFS") and posttraumatic stress disorder ("PTSD"). However, on July 26, 2012, when Flaherty filled out Entergy's annual medical history questionnaire in accordance with UAAP requirements, he failed to indicate that he was seeking treatment for depression and anxiety, suffering from frequent diarrhea, and experiencing "back trouble, injury, [and] pain." Nor did he disclose any of the symptoms or conditions for which he was seeking VA benefits to Entergy's evaluating physician.

On July 8, 2013, Flaherty was examined at a VA medical facility, and on October 10, 2013, he completed a "Chronic Fatigue Syndrome Disability Benefits Questionnaire." Among other things, he reported that his CFS symptoms "began mid 2009 and have continued and worsened since." He stated that his symptoms included "poor attention," "inability to concentrate," and "forgetfulness," and that those symptoms were "nearly constant." In between these two VA appointments, on August 8, 2013, Flaherty filled out another Entergy medical history questionnaire where he again failed to indicate that he was suffering from depression and anxiety, frequent diarrhea, and "back trouble, injury, [and] pain." Furthermore, the form had changed since 2012 and now included a specific question about PTSD, which Flaherty denied

experiencing.  As with his 2012 questionnaire, Flaherty did not disclose any conditions for which he was seeking VA disability benefits to his evaluating physician.

On October 22, 2013, the VA granted Flaherty disability benefits for CFS, PTSD, radiculopathy, chronic diarrhea, and lumbar strain, finding that his CFS symptoms restricted his daily activities "to 50 to 75 percent of the pre-illness level[s]."  On October 29, 2013, he was awarded monthly benefits retroactive to August 1, 2012.

On May 10, 2014, Flaherty applied for short-term medical leave from work at Entergy under the Family and Medical Leave Act ("FMLA") for the period between May 11, 2014 and July 15, 2014. The FMLA leave application did not include specific information from Flaherty himself about the basis for his leave, but did include a handwritten note from a VA clinical psychologist, named Dr. Julie Klunk-Gillis, stating:

> Veteran stating that he is struggling with daily anxiety, depressive symptoms, and insomnia. He is diagnosed with PTSD and Prolonged Depressive Disorder. Veteran would benefit from individual + group therapy as well as psychiatry to address his symptoms. Prognosis is good with consistent treatment.  Veteran denies any risk to self or others currently or in the past.

Neither Dr. Klunk-Gillis nor Flaherty referenced any CFS symptoms or diagnosis in Flaherty's application for medical leave. Furthermore, prior to returning to work in July, Flaherty was

cleared to work by both Dr. Klunk-Gillis and a nurse practitioner, Shelia Shea, from Cape and Islands Occupational Medicine, P.C. in Hyannis, Massachusetts. Neither of these medical clearances contained references to CFS, and there is no evidence that Entergy or any of Flaherty's direct supervisors were told at the time of Flaherty's FMLA leave that he was suffering from CFS.

After returning to work, in his next annual medical history questionnaire on July 30, 2014, Flaherty again neglected to indicate that he was suffering from "[d]epression/anxiety/other psychological disorder"; PTSD; frequent diarrhea; and "[b]ack trouble, injury, pain." He denied that he was taking medications and failed yet again to disclose any of the diagnosed conditions for which he was receiving VA disability benefits to the evaluating physicians.

On March 25, 2015, as part of a five-year evaluation for continued UAAP certification, Flaherty was interviewed by Dr. George Peters, a psychologist working with a company named The Stress Center. Without evaluating any of Flaherty's background information, The Stress Center found that Flaherty's psychological status was "acceptable for unescorted access authorization."

### 3. Flaherty Refuses to Work Mandatory Overtime

On February 14, 2015 -- right before his five-year evaluation -- Flaherty refused to work a mandatory overtime shift

scheduled for February 17, 2015, claiming that he would be too fatigued to work. Recognizing that it was uncommon for people to self-report fatigue three days in advance, Flaherty's supervisors initiated an investigation into Flaherty's fatigue claim on February 28, 2015. Following a "consensus meeting" on March 26, 2015, Entergy notified Flaherty on April 23, 2015 that he would be suspended for three days for refusing to work a mandatory overtime shift.

**4. Flaherty Calls Entergy's Ethics Hotline, and Entergy Initiates an Investigation Resulting in Flaherty's Termination**

On April 24, 2015, Flaherty called Entergy's ethics hotline to make a complaint about his suspension. He reported that he was a "disabled veteran who suffers from chronic fatigue syndrome" and that, although his supervisors were not aware of his medical condition, he "plan[ned] to present them with documentation of his medical condition." Flaherty's complaint was forwarded to the UAAP department at Entergy, and on April 28, 2015, Entergy placed on hold his unescorted access authorization pending further investigation into his recent disclosure that he was suffering from CFS.

As a follow-up to his ethics complaint, on April 29, 2015, Flaherty provided his VA medical records to his supervisor, who then forwarded them to the UAAP department. The UAAP

-8-

department reviewed Flaherty's records along with his previously submitted annual medical questionnaires and concluded that Flaherty had failed to disclose his disabilities -- most importantly the CFS -- on the questionnaires. Next, as a part of the investigation, Flaherty was given a medical examination by Dr. Kenneth Boyd and a psychological evaluation by Dr. Laurence Baker.

In his May 1, 2015 report, Dr. Boyd found that Flaherty had "not been forthcoming about his previous and ongoing medical diagnoses when queried about his medical history at the time of his annual exams" and "did not notify the medical department of important medical conditions that needed to be considered in evaluating him for his ability to adequately and safely perform security officer duties in a timely manner." In his May 11, 2015 report, Dr. Baker found that Flaherty should have disclosed his disabilities during his medical exams and clinical interviews. Dr. Baker also conducted the "Minnesota Multiphasic Personality Inventory -- 2" test, finding that Flaherty was highly defensive and suffered from depression and anxiety. In all, Dr. Baker concluded that "Mr. Flaherty does not appear to be acceptable for unescorted access in a nuclear facility, or to be qualified to be employed as a security officer in such a setting."

Based on Entergy's investigation, the UAAP department concluded that Flaherty did not satisfy the requirements for

continued unescorted access authorization because he did not exhibit the "trustworthiness and reliability" required under NRC regulations for UAAP certification.  As a result, on May 12, 2015, Entergy denied Flaherty unescorted access authorization for a period of five years.  According to NRC regulations, Flaherty could no longer work as a security officer at Pilgrim, and Entergy terminated his employment on May 19, 2015.  Entergy maintained that it did not deny Flaherty's unescorted access authorization or terminate him on account of his disabilities but denied his UAAP certification solely on the basis of his lack of trustworthiness and reliability in failing to report his CFS.  Entergy had previously revoked the unescorted access authorization from two other security officers who had failed to disclose important information. These other officers did not have known disabilities.

## B.  Procedural History

On May 26, 2015, Flaherty filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") against Entergy[2] alleging disability-based discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Mass. Gen. Laws ch. 151B, § 4(16) ("Chapter 151B").[3]

---

[2]  The complaint initially named Entergy Louisiana, LLC, but Flaherty later amended the MCAD charge to correct Entergy's name to Entergy Nuclear Operations, Inc.

[3]  Flaherty initially filed the charge pro se but then secured

Six months later, Flaherty requested permission to withdraw the matter from the MCAD, and the Equal Employment Opportunity Commission ("EEOC") eventually issued a right-to-sue letter. Thereafter, on August 16, 2016, Flaherty filed a complaint in the U.S. District Court for the District of Massachusetts.

In his complaint, Flaherty asserted claims for disability discrimination and failure to accommodate under the ADA and Chapter 151B. Specifically, he claimed that Entergy terminated his employment on the basis of his disabilities and that it failed to provide him with reasonable accommodations by refusing to excuse him from having to work overtime. After discovery, Entergy moved for summary judgment, seeking the dismissal of all claims. After Flaherty filed an opposition to the motion for summary judgment accompanied by his own affidavit, Entergy moved to strike certain portions of Flaherty's affidavit on the grounds that they contradicted Flaherty's prior testimony and mischaracterized documents in the record.

On July 9, 2018, the district court issued a memorandum and order granting in part Entergy's motion to strike and granting Entergy's motion for summary judgment. Flaherty v. Entergy Nuclear Operations, Inc., No. 16-11667-FDS, 2018 WL 3352957 (D. Mass.

representation on October 30, 2015.

-11-

July 9, 2018). The district court struck those portions of Flaherty's affidavit covering his initial diagnosis with CFS and PTSD and non-disclosure to Entergy because, according to the court, they conflicted with Flaherty's prior sworn testimony at his deposition, and he had failed to provide a satisfactory explanation for the change in testimony.[4] Id. at *10-12.

The district court then turned to Entergy's motion for summary judgment. It found that Flaherty had failed to establish the second element of a prima facie case of disability discrimination -- i.e., that he was a qualified individual capable of performing the essential functions of the position he held. Id. at *15-16. The court reasoned that "[b]y concealing his [CFS] diagnosis -- which undoubtedly impacted his ability to work as a security guard -- Flaherty violated NRC regulations requiring that nuclear plant security personnel demonstrate trustworthiness and reliability." Id. at *15. Accordingly, Entergy could revoke Flaherty's unescorted access authorization, which he needed to be qualified to perform the essential functions of the position he held. Id. The court further noted that Entergy had offered a

_____

[4] In consequence, the court struck paragraphs 29, 37, 58, 66, 69, 72, 75, 93, 94, and 96 of Flaherty's affidavit to the extent they referred to CFS, and paragraphs 74, 88, 89, and 99 in their entirety. Flaherty, 2018 WL 3352957, at *11-12. The court also struck other paragraphs on other grounds, which are not relevant to this appeal. Id. at *8-14.

-12-

"legitimate, non-discriminatory reason for its decision to terminate" Flaherty's employment and that Flaherty had failed to provide any admissible evidence to show that Entergy's articulated reason was pretextual. Id. at *16. Therefore, the court dismissed Flaherty's disability discrimination claims. Id.

Furthermore, the court determined that Flaherty's failure to accommodate claims also fell short because they had not been administratively exhausted, as required before he could bring those claims in court. Id. at *17-18 (noting that an employee asserting claims under both the ADA and Chapter 151B must first file an administrative charge before commencing a civil action (citing Bonilla v. Muebles J.J. Álvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999) and Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996))). The court noted that, although Flaherty had filed a charge with the MCAD, that charge "solely allege[d] discrimination on the basis of disability" and "sa[id] nothing whatsoever about any failure to accommodate." Id. at *18. Thus, the court concluded that dismissal of the failure to accommodate claims was warranted. Finally, the court determined that without his unescorted access authorization Flaherty was not qualified to perform the essential functions of his position "even if an accommodation was possible." Id. at *16. Accordingly, the court granted summary judgment on both the disability discrimination and

-13-

failure to accommodate claims. Id. at *18.  Flaherty filed a timely

appeal.

## II.  Discussion

### A.  Motion to Strike

The district court granted in part Entergy's Motion to Strike and struck those portions of Flaherty's affidavit regarding: (1) the date of Flaherty's initial CFS diagnosis,[5] and (2) the date he disclosed his CFS diagnosis to Entergy.  Id. at *10-12.  The court based its finding on the fact that Flaherty had failed to provide a satisfactory explanation for the testimonial dissonance between his deposition and his affidavit.  Id. Flaherty argues that the district court abused its discretion in granting in part Entergy's Motion to Strike because his prior testimony at his deposition was neither clear nor unambiguous and he provided a satisfactory explanation for the change in testimony.

We review the district court's decision as to the evidentiary materials it will consider in deciding a motion for summary judgment only for "a clear abuse of discretion."  EEOC v. Green, 76 F.3d 19, 24 (1st Cir. 1996).

---

[5]  Although the district court also struck those portions of Flaherty's affidavit regarding the date when he was first diagnosed with PTSD, that is not an issue on appeal.

"When an interested witness has given clear answers to unambiguous questions [at deposition], he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 30 (1st Cir. 2019) (alteration in original) (quoting Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)).[6]

At his deposition, Flaherty testified that he did not disclose his CFS diagnosis to Entergy until April 29, 2015.[7] Then, in support of his opposition to Entergy's motion for summary judgment, Flaherty submitted an affidavit stating that he disclosed his CFS diagnosis to Entergy both in July 2014 (during Entergy's medical and psychological evaluation upon returning from FMLA leave) and in March 2015 (to Entergy's psychological evaluator, Dr. George Peters, as part of a full evaluation and investigation for fitness to unescorted access).

---

[6] In contrast, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgement." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002) (emphasis added) (citing Shepherd v. Slater Steels Corp., 168 F.3d 998, 1007 (7th Cir. 1999)).

[7] Specifically, Flaherty was asked, "[Y]ou never told anyone you had chronic fatigue until April 29, 2015, correct?," to which he responded, "That's correct."

Flaherty tries to explain the change in testimony by arguing that he was confused about the question in his deposition for two different reasons. First, he argues that because the question about not having told anyone that he had CFS until April 29, 2015 followed a series of questions regarding accommodation requests, he therefore believed the question "to be within the context of any request [he] made for accommodations." Second, he argues that he understood the question "to be asking whether [he] told any of [his] supervisors at Entergy about [his] CFS diagnosis before April 29, 2015."

The district court did not clearly abuse its discretion in finding that Flaherty's "two different explanations for the change" were unsatisfactory. Flaherty, 2018 WL 3352957, at *11. In considering whether to strike Flaherty's later contradictory testimony, the district court properly noted that "the question of when Flaherty disclosed his CFS to Entergy is one of the central issues, if not the central issue, in the case," inasmuch as Entergy's reasons for deeming Flaherty untrustworthy was that he had concealed his medical condition from Entergy, which in turn, impacted his ability to work as an armed security guard at a nuclear power plant. Id. Accordingly, the court reasoned that, "[t]he timing of the disclosure of CFS was thus not a collateral issue as to which a lapse in memory might be overlooked." Id.

We also agree with the district court that both the question posed to Flaherty at his deposition as well as his response were "clear and direct." Id. "Nothing about it was confusing or ambiguous," especially since neither the word "accommodation" nor "supervisors" was mentioned in the question. Id. Flaherty also failed to provide supporting evidence indicating that his post-summary judgment statement, rather than his deposition answer, was correct.[8] See Rodríguez v. Trujillo, 507 F. Supp. 2d 131, 136-37 (D.P.R. 2007) (finding a post-summary judgment affidavit including an explanation of confusion adequate to correct contradicting testimony because it was "supported by ample evidence"). In addition, Flaherty -- who was accompanied by his attorney at his deposition -- had ample opportunity to seek clarification about the questions posed to him at his deposition and his responses. See Colantuoni, 44 F.3d at 5 (noting that plaintiff's attorney "was present at the deposition, and had the opportunity to clarify any incorrect impressions"). Furthermore, he had the opportunity to "note any change or correction to [his] testimony and the reason therefor" upon receiving the deposition transcript, prior to Entergy filing its motion for summary

---

[8] Contrary to Flaherty's argument below, a note made in relation to his FMLA leave does not provide supporting evidence of the statement in his affidavit because the note did not mention CFS at all, but only PTSD and related symptoms.

judgment. Yet, Flaherty's "confusion" by the line of questioning seems to have materialized only after Entergy filed its motion for summary judgment. See Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006) (finding that the chronology of events -- where the plaintiff's affidavit contradicting her prior deposition testimony was executed only after the defendant had filed its motion for summary judgment -- was "probative of the fact that the non-movant was merely attempting to create an issue of fact"). Because Flaherty provided a clear answer to an unambiguous question during his deposition, which he then directly contradicted without satisfactory explanation in an affidavit filed only after Entergy moved for summary judgment, the district court did not clearly abuse its discretion in rejecting Flaherty's claim of "confusion" and striking his subsequent contradictory testimony.

We now turn to Flaherty's statements about his initial CFS diagnosis. At his deposition, Flaherty was asked: "[W]hen were you first formally diagnosed by a medical professional with PTSD and chronic fatigue syndrome?" Flaherty responded: "[A]round the middle of 2012, June or July when I was going to all my doctors['] appointments for the claim that I put in."[9] However,

---

[9] As the district court noted, Flaherty had similarly stated in his MCAD charge that he "ha[d] been rated with chronic fatigue syndrome by Veteran[s] Affairs in 2012." These statements were

-18-

in his affidavit, Flaherty reversed course and claimed that this response was "incorrect[]," for he "was not made aware of [his] diagnoses of CFS and PTSD until [he] received the VA's October 22, 2013 decision, in November, 2013," which granted his claim for disability payments. Flaherty did not explain this alleged mistake in his affidavit. Furthermore, although Flaherty acknowledged in his opposition to Entergy's Motion to Strike that his statement in the affidavit was "inconsistent with his deposition testimony," he argued that documentary evidence (i.e., the VA Rating Decision of October 22, 2013) supported his statement inasmuch as it referenced a CFS diagnosis while nothing else in the record referenced a "definitive, formal, physician's diagnos[is]" before October 22, 2013.

The district court found that Flaherty had not met his burden of satisfactorily explaining why his testimony changed. Flaherty, 2018 WL 3352957, at *12. It reasoned that the VA's letter granting Flaherty's claim for disability was not itself a medical diagnosis, but an "eligibility decision[] based on [a] diagno[sis] made by [a] physician[]." Id. (citing Miller v. Comm'r of Soc. Sec., No. 3:17-CV-295, 2018 WL 1357442, at *5 (S.D. Ohio Mar. 16, 2018) ("The VA Disability Rating System is

made before filing his complaint in court and the taking of his deposition.

-19-

diagnosis-driven and percentages are assigned based on diagnoses and certain specific objective or clinical findings.")) Thus, Flaherty must have been diagnosed with CFS at some time before October 22, 2013, when his claim was granted. Id.

Flaherty now argues that the district court abused its discretion in striking the sections of his affidavit related to the date of his CFS diagnosis because, according to him, his deposition testimony was neither clear nor unambiguous. He points to three places in the deposition where he seemingly indicated that he was diagnosed with CFS later than mid-2012 and submits that the inconsistent testimony creates an issue of credibility for the factfinder.

We note that Flaherty raises the argument that his deposition testimony was internally inconsistent for the first time on appeal. Below, he merely highlighted that the October 22, 2013 VA Rating Decision referenced his CFS diagnosis and that no other document referenced it before then. He cannot raise this new argument on appeal. See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("An appellant cannot change horses in mid-stream, arguing one theory below and a quite different theory on appeal.").

Faced with no satisfactory explanation for the alleged error in his deposition testimony, and in light of how the VA Disability Rating System works, the district court did not clearly

abuse its discretion in striking Flaherty's inconsistent statements in his affidavit.  In any event, even if the court had erred in striking the inconsistent statements, any such error would be harmless given that, as Flaherty himself concedes, the central issue of this case is not the date of Flaherty's CFS diagnosis, but the date he disclosed his knowledge of that diagnosis to Entergy.[10]  See Fed. R. Civ. P. 61 (providing that errors that do not affect "any party's substantial rights" do not warrant "vacating, modifying, or otherwise disturbing a judgment or order").  We note that even if Flaherty was not aware of his CFS diagnosis until November 2013, he nevertheless waited eighteen months (until April 2015) to notify his employer about his CFS diagnosis.

## B.  Granting of Summary Judgment

We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir.

---

[10]  Specifically, in his opposition to Entergy's Motion to Strike, Flaherty stated that "[t]he Court should note that the central issue to which both the relevant deposition testimony and [the challenged statement in his affidavit] relate are a) when Mr. Flaherty disclosed to Entergy his mental health diagnoses and b) when was it reasonable for him to have done so under the NRC regulations and Entergy policy."

2015); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The party opposing summary judgment bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003) (citation omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986) (warning that the nonmoving party may not simply "rest upon mere allegations or denials of his pleading," but instead must "present affirmative evidence").

## 1. Discrimination Claims

The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Where, as here, the plaintiff does not have direct evidence of discriminatory animus, we generally apply the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Mancini v. City of Providence, 909 F.3d 32, 38 (1st Cir. 2018).

Under the McDonnell Douglas framework, a plaintiff alleging an ADA claim for discriminatory firing has the initial burden of establishing a prima facie case by showing that he (1) was disabled within the meaning of the ADA, (2) was a "qualified individual," and (3) was discharged in whole or in part because of his disability. Phelps v. Optima Health, Inc., 251 F.3d 21, 24 (1st Cir. 2001). Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Accordingly, our analysis of whether an individual is qualified requires us to determine: "first, whether the individual can perform the essential functions of [his] position; and second, if [he] is unable to perform those essential functions, whether any

reasonable accommodation by [his] employer would allow [him] to do so." Phelps, 251 F.3d at 25.

If the plaintiff establishes his prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33-34 (1st Cir. 2001). If the employer articulates such a reason, the burden shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's proffered reason for the adverse employment action was pretextual and that the true reason was unlawful discrimination. Id. at 34.[11]

Flaherty challenges the district court's conclusion that he did not establish a prima facie case of disability discrimination because he did not set forth sufficient evidence from which a reasonable jury could conclude that he was qualified for the position he held. Specifically, Flaherty takes issue with the court's reasoning that Entergy properly revoked his unescorted

---

[11] Flaherty also brought claims under Chapter 151B, which prohibits discrimination in employment against qualified individuals with disabilities. Mass. Gen. Laws ch. 151B, § 4(16). Flaherty does not contest that his Chapter 151B claims should be evaluated under the same standards as ADA claims, as has been done before. See, e.g., Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153-54 (1st Cir. 2009) (evaluating discrimination claims brought under both Chapter 151B and the ADA under the same framework).

access authorization due to his unreliability and untrustworthiness (as evidenced by his failure to disclose his CFS diagnosis until April 2015), without which he was not qualified to work as a security officer at Entergy.

Flaherty concedes that he needed to maintain his unescorted access authorization to remain qualified for the position he held.[12] See McNelis v. Pa. Power & Light Co., 867 F.3d 411, 415 (3d Cir. 2017) (affirming summary judgment for the employer, concluding that a terminated nuclear security officer was unable to perform the essential functions of the job after losing his unescorted access authorization). He also implicitly concedes that a finding that he intentionally failed to disclose his CFS diagnosis until April 2015 would support Entergy's conclusion that he was untrustworthy and unreliable and that his unescorted access authorization was properly revoked. Flaherty thus centers his efforts on disputing the finding that he failed to disclose his CFS to Entergy until April 2015. In doing so, Flaherty points to the statements stricken from his opposition to

---

[12] This concession disposes of Flaherty's argument in his opening brief that he must have been able to perform the essential functions of his job because he had held that position for a number of years. As Entergy notes and Flaherty concedes in his reply brief, pursuant to the NRC regulations, having the unescorted access authorization was essential for Flaherty's ability to perform his job as a security officer.

Entergy's motion for summary judgment which, according to him, establish that he disclosed his CFS diagnosis on two occasions prior to April 2015: (1) in July 2014 to a nurse practitioner from Cape and Islands Occupational Medicine, P.C. upon his return from FMLA leave, and (2) in March 2015 to Dr. Peters, a psychological evaluator working with The Stress Center, as part of a full evaluation and investigation for fitness to unescorted access. Furthermore, Flaherty now argues for the first time that the nurse's and Dr. Peters's alleged knowledge of his CFS diagnosis should be imputed to Entergy because they were hired by Entergy to examine Flaherty and, thus, "were Entergy's agents."

As the district court noted, Flaherty has offered no evidence that Entergy was aware of his CFS diagnosis before April 2015 except for the stricken portions of his affidavit. Thus, Flaherty's challenge to the entry of summary judgment against his disability discrimination claim fails due to our decision regarding the statements that the district court struck from his affidavit. Since we have already found that the district court did not abuse its discretion in striking those statements which contradicted his prior testimony, it follows that the district court correctly concluded that Flaherty failed to establish a prima facie case of disability discrimination inasmuch as he could not

-26-

prove that he was qualified for the position he held at Entergy.[13]
In other words, because Flaherty's failure to disclose his CFS
diagnosis until April 2015 made him untrustworthy and unreliable,
Entergy was entitled to revoke his unescorted access
authorization, which Flaherty needed to perform the essential
functions of the position he held in order to be deemed a qualified
individual.[14]  Our conclusion that Flaherty failed to establish a

---

[13]   This conclusion disposes of Flaherty's argument that the
medical examiners' alleged knowledge of his CFS diagnosis should
be imputed to Entergy because they were its agents.  If Flaherty
did not share his CFS diagnosis with the medical examiners, then
he cannot establish that they had any knowledge that could be
imputed to Entergy.  In any event, this new argument would be
waived because Flaherty did not raise it below.  We note that,
although Flaherty referred to the nurse and Dr. Peters as
"Entergy's medical evaluators" below, he did not make the argument
he now makes on appeal that they were Entergy's agents and that
their knowledge should be imputed to Entergy.  See United States
v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to
in a perfunctory manner, unaccompanied by some effort at developed
argumentation, are deemed waived.").

[14]   We note that even if we were to reverse the district court's
striking of Flaherty's statements that he disclosed his CFS
diagnosis to Entergy in July 2014, Flaherty would still have failed
to disclose his condition on prior occasions over several years
beforehand.  We also note that, according to Flaherty, he did not
disclose his CFS condition earlier because he did not believe he
needed to do so, for he did not think it interfered with his
ability to perform his duties.  Yet, it was up to Entergy, not
Flaherty, as mandated by the NRC, to decide what he needed to
disclose to his employer about his mental health and when.  See
McNelis, 867 F.3d at 416 ("[T]his is a feature -- not a bug -- of
the nuclear regulatory scheme.  Presumably because of the
sensitive nature of the work, the Nuclear Regulatory Commission
made a policy judgment that, for a limited number of jobs, nuclear
power plants must screen employees for certain traits and behaviors

-27-

prima facie case of disability discrimination makes it unnecessary to address the remaining stages of the McDonnell Douglas burden-shifting framework.

### 2. Failure to Accommodate Claims

The ADA compels an employer "to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on [its] operation of the business.'" Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 604 (1st Cir. 2017) (alterations in original) (quoting 42 U.S.C. § 12112(b)(5)(A)); see also U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 396 (2002). To establish a claim for failure to accommodate, a plaintiff must produce sufficient evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA, (2) he was a qualified individual, and (3) the defendant, despite knowing of the plaintiff's disability, did not reasonably accommodate it. See 42 U.S.C. §§ 12111(8), 12112(b)(5)(A); Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 63 (1st Cir. 2004).

---

that may endanger the public.").

Individuals asserting discrimination or failure to accommodate claims under the ADA are required to file an administrative charge with the EEOC, or alternatively, with an appropriate state or local agency, prior to commencing a civil action.[15]  See Bonilla, 194 F.3d at 278.  The judicial complaint subsequently filed "must bear some close relation to the allegations presented to the agency."  Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005).

Although Flaherty filed an administrative charge with the MCAD, Entergy argues that the charge related only to Flaherty's disability discrimination claims, and thus, his failure to accommodate claims should be dismissed for non-exhaustion of administrative remedies.  We bypass the exhaustion issue because Flaherty's claims clearly fail on the merits.  See Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 223-24 (1st Cir. 2012).

Flaherty's failure to accommodate claims require sufficient evidence that he was a "qualified individual."

---

[15]  "[The] charge 'shall be filed' with the EEOC 'within one hundred and eighty days after the alleged unlawful employment practice occurred,' or within 300 days if 'the person aggrieved has initially instituted proceedings with [an authorized] State or local agency.'"  Bonilla, 194 F.3d at 278 (second alteration in original) (quoting 42 U.S.C. § 2000e-5(e)).  Because the EEOC and the MCAD have a "worksharing agreement," "claims filed with either the MCAD or the EEOC are effectively filed with both agencies."  Davis v. Lucent Techs., Inc., 251 F.3d 227, 230 n.1 (1st Cir. 2001) (citing Isaac v. Harvard Univ., 769 F.2d 817, 824 (1st Cir. 1985)).

See 42 U.S.C. § 12111(8); Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 107 (1st Cir. 2005). Flaherty needed to prove that "the proposed accommodation would have enabled [him] to perform the essential functions of [his] job." Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 127 (1st Cir. 2017) (citing Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001)); see also 42 U.S.C. § 12111(8). He has not presented such evidence. Rather, the undisputed evidence, as discussed earlier, includes Flaherty's admission that he needed unescorted access authorization to perform the essential functions of his position. Even had Entergy granted Flaherty's request to be excused from occasionally working overtime, his loss of the unescorted access authorization would have rendered him unable to perform the essential functions of his job. The district court thus properly granted Entergy's motion for summary judgment as to Flaherty's failure to accommodate claims.[16]

---

[16] We note that Flaherty also challenges the district court's findings that: (1) the disabilities caused by his CFS and PTSD prevented him from performing the essential job functions of the position he held and no reasonable accommodation was possible, and (2) Entergy was not required to engage in an interactive process with Flaherty to determine an appropriate accommodation because without his unescorted access authorization he could not perform the essential functions of his position, even with an accommodation. Nevertheless, our conclusion that without his unescorted access authorization Flaherty was not able to perform the essential functions of the position he held, and thus was not a qualified individual, makes it unnecessary to further address these additional arguments. See Kvorjak v. Maine, 259 F.3d 48,

## III. Conclusion

For the foregoing reasons, we affirm the district court's order.

**Affirmed.**

---

52 (1st Cir. 2001) ("[L]iability [for failure to engage in the interactive process] . . . depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions."); Phelps, 251 F.3d at 26 ("[A]n employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees.").