PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3883
_____

DARYLE RAYMOND MCNELIS,
                                        Appellant

v.

PENNSYLVANIA POWER & LIGHT COMPANY
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 4-13-cv-02612)
District Judge: Honorable Matthew W. Brann
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 26, 2017

Before: HARDIMAN, ROTH, and FISHER, *Circuit Judges*.

(Opinion Filed:  August 15, 2017)

Ralph E. Lamar, IV
8515 Braun Loop
Arvada, CO 80005

Marc E. Weinstein
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
        *Counsel for Appellant*

Darren M. Creasy
A. James Johnston
Post & Schell
1600 John F. Kennedy Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA 19103
        *Counsel for Defendant-Appellee*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

Daryle McNelis appeals the District Court's summary judgment in favor of his former employer, PPL Susquehanna, LLC.[1] McNelis worked at PPL's nuclear power plant as an armed security officer from 2009 until he was fired in 2012 after failing a fitness for duty examination. McNelis sued,

---

[1] After this case was filed, McNelis's former employer, misidentified in the caption as Pennsylvania Power & Light Company, was renamed Susquehanna Nuclear, LLC.

claiming his termination violated the Americans with Disabilities Act. The District Court disagreed, holding that McNelis was fired because he lacked a legally mandated job requirement, namely, the unrestricted security access authorization that the United States Nuclear Regulatory Commission requires of all armed security guards. For the reasons that follow, we will affirm the judgment of the District Court.

I

This appeal requires us to analyze the relationship between the Americans with Disabilities Act (ADA) and the regulations promulgated by the Nuclear Regulatory Commission (NRC). We begin with the governing regulations and then turn to the facts of the case.

A

As the operator of a nuclear power reactor, PPL was required to comply with regulations issued by the NRC, two of which are seminal to this appeal.

First, PPL was required to implement a "fitness for duty program" to ensure that "individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." 10 C.F.R. § 26.23(b). If an employee's fitness is "questionable," the employer "shall take immediate action to prevent the individual from" continuing to perform his duties. 10 C.F.R. § 26.77(b).

3

PPL also was required to maintain an "access authorization program" to monitor employees who had access to sensitive areas of the plant. 10 C.F.R. § 73.56(a)–(b). Under this program, nuclear power plants must "provide high assurance" that employees "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security." 10 C.F.R. § 73.56(c). Before an employee is granted unrestricted access, he must undergo a psychological assessment that evaluates "the possible adverse impact of any noted psychological characteristics on the individual's trustworthiness and reliability." 10 C.F.R. § 73.56(e). Once granted, unrestricted access is subject to constant monitoring. Nuclear power plants must institute a "behavioral observation program" to identify aberrant behaviors. 10 C.F.R. § 73.56(f). All employees are required to report suspicious behaviors, and any report triggers a reassessment of that employee's access. 10 C.F.R. § 73.56(f)(3). If during the reassessment an official believes the employee's "trustworthiness or reliability is questionable," the official must terminate the employee's unrestricted access during the review period. *Id.*

B

PPL hired Daryle McNelis as a Nuclear Security Officer in 2009. In that role, McNelis had unrestricted access to PPL's plant and was responsible for, among other things, protecting its vital areas and preventing radiological sabotage. McNelis carried a firearm (often an AR-15) and was authorized to use deadly force.

In April 2012, McNelis experienced personal and mental health problems. McNelis was paranoid about surveillance. He believed that various items in his home (such

4

as his children's toy cars) were covert listening devices and he told his wife he would kill whoever was following him. McNelis also had problems with alcohol and his "use of alcohol [was] an issue of contention with his wife." App. 32. Finally, a close friend and co-worker of McNelis named Kris Keefer believed McNelis had become obsessed with bath salts—a synthetic drug that affects the central nervous system. McNelis had admitted to using bath salts in the past and co-workers suspected he was doing so again.

In the midst of these troubles, McNelis's wife moved herself and the children out of the family home. That same day, local police received an anonymous 911 call warning that McNelis may "come to the schools to get his children" and "may be under the influence and possibly armed." App. 19. The school district was locked down for two hours—but the police eventually determined that McNelis never intended to go to the schools.

Two days later, McNelis agreed to meet his wife at a psychiatric facility for treatment. The treating physician's initial evaluation noted that McNelis suffered from "paranoid thoughts, . . . sleeplessness, [and] questionable auditory hallucinations." App. 26–27. After a three day stay in the inpatient unit, McNelis was discharged with instructions to "[d]iscontinue or reduce the use of alcohol." App. 28.

During the events of April 2012, McNelis's friend and co-worker Keefer became concerned by McNelis's behavior. As required by NRC regulations and PPL policy, Keefer reported his concerns to a supervisor, explaining that McNelis was "emotionally erratic[,] . . . not sleeping well and having illusions" about surveillance. App. 20. Keefer also opined that McNelis's behavior warranted "immediate attention." *Id.*

Pursuant to NRC regulations, McNelis's unrestricted access was "placed on hold" pending medical clearance. App. 29.

McNelis then met with Dr. David Thompson—a third-party psychologist who performs fitness for duty examinations at approximately 20 nuclear facilities nationwide, including PPL's plant. Dr. Thompson interviewed McNelis and performed testing required by PPL policy and NRC regulations. *See* 10 C.F.R. §§ 26.187, 73.56(e)(6). He then issued two reports, the second of which—a Substance Abuse Expert Determination of Fitness report—stated that "McNelis is considered not fit for duty pending receipt and review of a report from the facility where he receives an alcohol assessment and possibly treatment." App. 35.

Upon learning that McNelis had been deemed not fit for duty by Dr. Thompson, PPL revoked McNelis's unescorted access authorization and terminated his employment. After his internal appeal was denied, McNelis filed this suit. The District Court granted PPL summary judgment and McNelis timely appealed.

II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over McNelis's challenge to the District Court's summary judgment. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). McNelis sued under the ADA, the Rehabilitation Act, and the Pennsylvania Human Relations Act, all of which are "interpreted consistently" and share "the same standard for determination of liability." *Macfarlan v. Ivy Hill SNF, LLC*,

675 F.3d 266, 274 (3d Cir. 2012). For the sake of brevity, we will analyze the statutes together and reference only the ADA.

III

McNelis claims his termination violated the ADA because "he was erroneously regarded as having a disability in the form of alcoholism, mental illness and/or illegal drug use, and that this misperception was a motivating factor in his firing." McNelis Br. 26. To establish a prima facie case under the ADA, McNelis had to establish that he "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006). The parties contend, and we agree, that this case turns on the second prong: whether McNelis is a "qualified individual."

"A two-part test is used to determine whether someone is a qualified individual with a disability." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (citation omitted). First, the individual must satisfy "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." 29 C.F.R. Pt. 1630 (Appendix). Second, the individual must be able to "perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.*

Whether or not McNelis could satisfy the first part of the analysis, we agree with PPL that McNelis could not perform the "essential functions" of his job. NRC regulations require Nuclear Security Officers to be fit for duty, 10 C.F.R. § 26.4(a), and to maintain unescorted security clearance, 10 C.F.R. § 73.56(b)(1). Because McNelis did not satisfy either

7

legally mandated requirement at the time he was fired, his claim failed as a matter of law.

Although we are the first court of appeals to address the interplay between the ADA and these NRC regulations, our opinion is supported by a broad consensus among district courts that nuclear power plant employees who have lost security clearance or have been deemed not fit for duty are not qualified employees under the ADA. *See Stevens v. S. Nuclear Operating Co.*, 2016 WL 4535662, at *5 (S.D. Ga. Aug. 30, 2016) ("[B]ecause Plaintiff was determined not fit to return to work during the relevant time periods, she could not perform the essential functions of the job."); *Lute v. Dominion Nuclear Conn., Inc.*, 2015 WL 1456769, at *8 (D. Conn. Mar. 30, 2015) ("The Court finds that having [unrestricted access authorization] was essential to [the plaintiff's] job as a Plant Equipment Operator in a nuclear power facility, and without it, he was not 'otherwise qualified to perform the essential functions of his job . . . .'"); *Wetherbee v. S. Nuclear Operating Co.*, 2010 WL 11428172, at *7 (N.D. Ga. Mar. 17, 2010) ("[A]n essential job function of the [plaintiff's position at the NRC-regulated plant] is that the employee filling that position be determined to be fit for duty as required by the NRC . . . ."); *Sysko v. PPL Corp.*, 2009 WL 4725240, at *8 (M.D. Pa. Dec. 2, 2009) ("[A]n employee who is unable to maintain unescorted access status is not qualified to perform the essential functions of a position within the [NRC-regulated] nuclear facility."); *Mathieson v. Am. Elec. Power*, 2002 U.S. Dist. LEXIS 6560, at *10 (W.D. Mich. Jan. 14, 2002) ("An employee's inability to satisfy [the NRC's] legally dictated fitness-for-duty program is 'by its very nature an essential function.'" (citation omitted)); *McCoy v. Pa. Power and Light Co.*, 933 F. Supp. 438, 444 (M.D. Pa. 1996) ("[I]t is apparent

8

as a matter of law that plaintiff is not a qualified individual with a disability within the meaning of the ADA, since his disability precludes him from retaining the security clearance necessary to perform his former job."). These decisions are based on the well-settled proposition that "a legally-defined job qualification is by its very nature an essential function under [the ADA]." *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998).

We also find support in the opinions of our sister courts of appeals that have applied the same rationale in cases raising analogous ADA claims that implicate Department of Transportation (DOT) regulations. For example, in *Hawkins v. Schwan's Home Service, Inc.*, the Tenth Circuit rejected an ADA claim brought by an employee who was fired for failing a DOT-mandated medical examination. 778 F.3d 877, 895 (10th Cir. 2015). The court reasoned that the employer's insistence on DOT certification "stems directly from the federal motor-safety regulations, which preclude a person from 'driving a commercial motor vehicle unless he/she is . . . medically certified as physically qualified to do so.'" *Id.* (alterations and citations omitted). The court held that "being DOT-certified is an automatic, binding, and utterly unavoidable requirement"—and was thus an "essential function" of the employee's job. *Id.*; *see also Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 812 (5th Cir. 2016) (holding that the plaintiff "failed to establish that he was qualified for the job in question . . . [b]ecause he lacked the DOT certification required by federal law"); *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 639 (8th Cir. 2003) (affirming dismissal of an ADA claim where the employer "was applying the [DOT regulations] to which it was bound"); *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("Under

9

applicable DOT regulations, [the employer] was not allowed to permit [the plaintiff] to resume driving until he produced a copy of a doctor's certificate indicating he was physically qualified to drive, and nothing in the ADA purports to change that obligation." (citations omitted)).

Finally, our holding is in accord with the Supreme Court's decision in *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999). In that case, the plaintiff was fired from his job as a truck driver after his incurable eye disorder prevented him from meeting DOT vision standards. *Id.* at 559. In ruling on the plaintiff's ADA claim, the Court explained that the employer has an "unconditional obligation to follow the [DOT] regulations and [a] consequent right to do so," and therefore could fire the plaintiff due to his vision issues. *Id.* at 570. The Court found "crucial" to its holding the fact that Albertson's "was not insisting upon a job qualification merely of its own devising," but was complying with a regulation that was concededly valid and "ha[d] the force of law." *Id.* It deemed its holding consistent with the structure of the ADA because, "[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law." *Id.* at 573.[2]

---

[2] *Albertson's* reveals another fatal flaw in McNelis's cause of action. Even assuming for the sake of argument that McNelis could demonstrate a prima facie case, compliance with federal law provides PPL with a defense to McNelis's suit. As the Supreme Court recognized, an employer has a right to "insist on" compliance with legally mandated job requirements. *Albertson's*, 527 U.S. at 571. And the implementing regulations of the ADA provide that it is a defense to a claim of discrimination "that a challenged action

10

McNelis makes several counterarguments, none of which we find persuasive. First, he notes that a judgment in favor of PPL would diminish "the protections of the ADA for workers in sensitive positions within the nuclear industry." McNelis Br. 29. Contrary to McNelis's characterization, this is a feature—not a bug—of the nuclear regulatory scheme. Presumably because of the sensitive nature of the work, the Nuclear Regulatory Commission made a policy judgment that for a limited number of jobs, nuclear power plants must screen employees for certain traits and behaviors that may endanger the public. *See* 10 C.F.R. § 26.23; 10 C.F.R. § 73.56(c); *see generally Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562, 565 n.5 (8th Cir. 1988) (noting that nuclear power plant employees have diminished workplace rights because "the danger of catastrophic loss of health and life is so great"). The NRC regulations do not exempt individuals with disabilities, and indeed, it would be strangely ineffective for them to do so; the fact that a certain trait or behavior coincides with a recognized disability does not make it any less dangerous to the public. To the contrary, NRC regulations explicitly require nuclear power plants to screen for traits and behaviors in a manner that in

---

is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action . . . that would otherwise be required." 29 C.F.R. § 1630.15(e); *see also Bay*, 212 F.3d at 975 ("[The employer] may assert [the employee's] lack of [DOT] certification as a valid defense to [his] ADA claim."). To rule otherwise "would force a Hobson's choice" on PPL, leaving it to pick between ADA liability on the one hand and administrative penalties on the other. *Brickers*, 145 F.3d at 850.

other contexts may violate the ADA.[3] And the premise that the ADA applies differently to professions that implicate the public welfare is as essential as it is unremarkable. *See, e.g.*, *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("Police departments place armed officers in positions where they can do tremendous harm if they act irrationally. Contrary to [the plaintiff's] contention, the ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination . . . .").

Next, McNelis claims he should have been afforded "an opportunity to address the erroneous perception of Dr. Thompson and PPL." Reply Br. 14. In fact, McNelis was given that chance through the review procedures outlined in the NRC regulations. *See* 10 C.F.R. § 73.56(l); 10 C.F.R. § 26.39. McNelis received through the administrative process an "impartial and independent internal management review" and was given "an opportunity to provide additional relevant information and an opportunity for an objective review of the information upon which the [decision] was based." 10 C.F.R. § 73.56(l). Thus, McNelis's claim that he had "no way to legally challenge [PPL's] erroneous perception," McNelis Br. at 33, is incorrect.

---

[3] *Compare* 10 C.F.R. § 73.56(e) (requiring nuclear employees to pass a psychological assessment that screens for "any noted psychological characteristics on the individual's trustworthiness and reliability"), *with Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 953 n.5 (3d Cir. 1996) (noting that the ADA generally prohibits discrimination based on "[a]ny mental or psychological disorder, such as . . . emotional or mental illness").

To the extent McNelis argues he was entitled to more process than that delineated by the NRC regulations, he is again mistaken. While PPL had an "unconditional obligation to follow the regulations," it also had a "*consequent right to do so*." *Albertson's*, 527 U.S. at 570 (emphasis added). Although McNelis contends that PPL acted too "precipitously" in revoking his access authorization or should have provided him an opportunity to more "fully engage" in the review process, Reply Br. at 13, PPL was permitted to follow the NRC regulations that provided otherwise.

McNelis does not seriously dispute that PPL followed the procedures outlined in the NRC regulations,[4] but argues that his termination was discriminatory because PPL typically does not fire employees before giving them a chance to regain access. But "the fact that certain accommodations may have been offered . . . to some employees as a matter of good faith

---

[4] In his reply brief, McNelis argues in passing that PPL did not inform him of the reason he lost unrestricted access, as required by 10 C.F.R. § 73.56(l) ("[T]he individual [must be] informed of the grounds for the denial or unfavorable termination" of "access authorization."). As support for this argument, McNelis notes that his *employment* termination letter "told [him] absolutely nothing with regard to the reason PPL fired him." Reply Br. at 9 (emphasis omitted). McNelis confuses termination of employment with termination of access. Here, the regulations require the employee to have the *access* termination explained, which PPL did as part of McNelis's review request. *See* App. 559 ("Reason for Denial/Revocation of Unescorted Access Authorization: SAE Evaluation," "Basis for Decision: Not Fit for Duty . . . Requires an Alcohol Assessment and Treatment Certification").

does not mean that they must be extended to [each employee] as a matter of law." *Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995). This is true even though PPL policy generally allows individuals to comply with treatment recommendations before termination. *See Smith v. Midland Brake, Inc.*, 138 F.3d 1304, 1310 (10th Cir. 1998) ("Absent proof of discrimination as defined by the ADA, an employer's failure to follow its own internal policies does not in itself constitute a violation of the ADA."), *rev'd on other grounds*, 180 F.3d 1154 (10th Cir. 1999) (en banc).

Finally, McNelis asserts that a jury could have deemed Dr. Thompson's fitness determination erroneous. In essence, McNelis claims PPL was not entitled to rely on Dr. Thompson's determination that he was not fit for duty in light of other evidence he submitted from his personal doctors. We disagree. The Supreme Court has indicated that in the ADA context, a court should not "second-guess" a physician's determination that an employee failed to meet the regulatory requirements of his job. *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 522 (1999). This is doubly true in the circumstances of this case, because NRC regulations *prohibited* PPL from questioning the determination of fitness after it was made by Dr. Thompson. 10 C.F.R. § 26.189(d) ("Neither the individual nor licensees . . . may seek a second determination of fitness if a determination of fitness . . . has already been performed by a qualified professional . . . .").[5]

---

[5] Because the District Court did not err when it held that McNelis did not meet his burden of establishing a prima facie case of discrimination, we need not consider the various issues related to whether his firing was pretextual. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir.

\*     \*     \*

For the reasons stated, we will affirm the judgment of the District Court.

---

2004). However, we note the incoherence of McNelis's theory that PPL used McNelis's fitness for duty concerns to mask that it was firing him because it thought he used bath salts and had psychological issues. Either of these allegedly forbidden reasons for his termination would have been additional valid reasons for PPL to have revoked McNelis's plant access. *See* 10 C.F.R. § 26.23(b) (requiring PPL to ensure that McNelis was not "mentally or physically impaired from any cause, which in any way adversely affects [his] ability to safely and competently perform [his] duties"). Thus, while McNelis may point to disparate treatment on account of his perceived disability, he cannot show that the disparate treatment amounted to discrimination. *See Doe v. Cty. of Centre, PA*, 242 F.3d 437, 447 (3d Cir. 2001) ("[T]he ADA allows disparate treatment in certain cases. . . . [and] recognizes that the goal of ending disability discrimination must be balanced against the health and safety risks that disabilities sometimes pose to others.").