PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT

No. 20-2247

KATHLEEN FOWLER,

Appellant

v.

AT&T, INC.; AT&T SERVICES, INC.

Appeal from the United States District Court for the District
of New Jersey (D.C. Civil Action No. 3-18-cv-00667)

District Judge: Honorable Michael A. Shipp

Argued on March 9, 2021

Before: SMITH, Chief Judge, McKEE and AMBRO, Circuit
Judges

(Opinion filed: November 26, 2021)

Stephen G. Console
Brian C. Farrell (Argued)
Laura C. Mattiacci
Susan M. Saint-Antoine
Console Mattiacci Law
1525 Locust Street
9th Floor
Philadelphia, PA 19102

        Counsel for Appellant


Kenneth Gage (Argued)
Davis M. Woodruff
Paul Hastings
200 Park Avenue
30th Floor
New York, NY 10166

        Counsel for Appellee

Sydney A. R. Foster
Jennifer S. Goldstein
Sharon F. Gustafson
Jeremy D. Horowitz (Argued)
Equal Employment Opportunity Commission
5th Floor
131 M Street, N.E.
Washington, DC 20507

    Counsel for Amicus Appellant United States Equal
    Employment Opportunity Commission

_____

OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>

Kathleen Fowler, a thirty-year veteran of AT&T and an epileptic breast cancer survivor, sued her former employer for age and disability discrimination. She claims that AT&T discriminated against her twice. First, it placed her on "surplus status" in January 2016, effectively giving her 60 days to find a new job or be terminated. Second, after she found a new job within AT&T, she was again placed on surplus status in October of that same year and ultimately terminated. In addition, she argues that the company failed to accommodate her disabilities in her new position.

The District Court granted AT&T's motion for summary judgment on all claims. We agree with the Court in ruling against Fowler, but we do so for different reasons. Contrary to

its conclusion, we hold that the January surplus selection for Fowler was an adverse employment action that could support a discrimination claim, even though she eventually found another job within the company. However, AT&T has provided powerful evidence that Fowler's January surplus selection was simply a neutral reduction in force, and she has not provided sufficient evidence to suggest that the company's explanation is actually a pretext masking discrimination. Thus her claims associated with the January action fail.

As for Fowler's termination following the October surplus selection, she may not maintain discrimination or failure-to-accommodate claims connected to a job for which she was not qualified. Because—by her own admission—Fowler was not qualified for her new position, her claims tied to the October surplus selection must also fail. Thus we affirm the judgment of the District Court.

## I. Background

AT&T employed Fowler from 1986 until her termination on December 27, 2016. She was diagnosed in 2006 with a seizure disorder (epilepsy) that caused cognitive impairments, including a decline in memory. In 2011, Fowler disclosed to AT&T her disability and its effect on her memory. Then, in January 2015, she was diagnosed with breast cancer and subsequently informed AT&T of her diagnosis and treatments.

In December 2015, AT&T planned to reduce Fowler's business unit, Technology Planning and Engineering, by consolidating roles, eliminating duplicative work, and reducing nonessential work. Employees affected by the workforce

4

reduction would be placed on "surplus status," which is what AT&T calls its layoff procedures. Its guidelines make clear the intent of surplus status is to eliminate "positions which are no longer needed" but is "not a performance management tool" and "is not intended to facilitate turnover within [AT&T]." App. at 276. When an employee is placed on surplus status, she is given two options: either elect to terminate her employment immediately and receive severance, or extend her employment by sixty days to search for other jobs within AT&T. *Id*. at 294, 321–22. If the employee elects the latter option (which is the default), she receives some priority in hiring and must accept any job offer that is extended (so long as it does not require relocation), or she will lose eligibility for severance benefits. *Id*. at 294–95, 321–22.

In January 2015, AT&T notified Fowler that she was being placed on surplus status. The company claims that her selection was purely neutral and was based on her performance ratings relative to her colleagues. It is undisputed that Fowler was performing her role competently prior to her surplus selection. *See, e.g.*, *id.* at 475 (a recent performance review indicating that she was a "key contributor" whose "performance solidly meets expectations"); *id.* at 447–48 (her supervisor's deposition stating that Fowler was "[a]bsolutely" a good employee who "did her job" and "cared very much about [it]," though there was room for improvement based on how she handled differences of opinion with her colleagues). Despite the satisfactory ratings, Fowler nonetheless received the sixth lowest ranking in her unit. Within her specific unit, seventeen employees were laid off. Fowler's rating was a 2.95, which her supervisor contended reflected a "very strong performer;" but with her organization being cut in size by nearly a third, the surplus line was drawn at a rating of 3.0. *Id*.

5

at 479.  In response, Fowler purportedly told her manager that she "believes the company cannot surplus someone with cancer" and that "she could sue for that."  *Id*.  While her supervisor acknowledged that she knew Fowler was going through chemotherapy for cancer, she did not think that "changes . . . this situation" one way or the other.  *Id*. at 477.

During her sixty-day job search period, and with the help of her managers, Fowler obtained two job offers within AT&T: one for a lead financial analyst position in Texas and another for a senior system engineer position in New Jersey.  The latter position involved "software development," "[s]enior level technical expertise" and "deep technical knowledge and subject matter expert[ise] on AT[&]T technologies."  *Id*. at 202.  After meeting briefly with Madhavi Aruva, the supervisor for the New Jersey position, Fowler believed she was qualified for the job.  She based her belief "on what [she] knew" at the time, relying primarily on the job description and some high-level descriptions Aruva had drawn on a whiteboard, which Fowler noted "sounded a little bit like things [she] had heard about in the past, [and that she had] worked on."  *Id*.  at 162–65.  Despite admitting that the Texas position was a better fit, and the New Jersey position "wasn't [her] first choice," Fowler selected the latter position to avoid moving while she was receiving cancer treatments.  *Id*.  at 164.  After she switched positions, AT&T claims that her earlier job duties were automated, discontinued, or spread out among three employees who were 49, 55, and 57 years of age.

Fowler began her new position in March 2016, and shortly thereafter informed her new supervisor that she was undergoing chemotherapy treatments for breast cancer.  She

6

asserts that during her first week her new supervisor commented on her hair during a meeting, exclaiming "[O]h my goodness . . . what happened to your hair[?]" *Id.* at 138. Fowler's apparent hair style change was because she did not have on the wig she wore after her chemotherapy treatments. She reported that her supervisor "just didn't understand that . . . was a [w]ig I [had been] wearing." *Id.*

It became clear almost immediately to Fowler and her supervisor that she was not a good match for this position. In April, less than two months after starting the job, Fowler emailed a higher-up supervisor requesting to be made releasable, *i.e.*, for permission to be considered for other jobs within AT&T. She stated that her "current job is not a skills match," stressing that her "experience in technical work was 13+ years ago and at [a different] level of detail." *Id.* at 8. In effect, she did not have the then-required skills or the training for the job. In May, Fowler sent another email, this time to her direct supervisor, bluntly stating that she was "not suited or qualified for this position" and that her "interpretation of the position, when originally interviewed, is not how [she] understood it to be nor does it align with [her] resume." *Id.* Another employee suggested that there were also interpersonal conflicts between Fowler and her new supervisor, recounting a conversation where Fowler purportedly told Aruva: "Everyone hates you on your team, you're a terrible supervisor, I can't understand you when you talk to me." *Id.* at 642. Fowler requested to be made "releasable" to pursue other positions within AT&T and told her supervisor that, were she instead offered a "[g]ood" early retirement package, she would "probably take it." *Id.* at 250. While AT&T did not immediately make her releasable, her supervisors relented at the end of May.

Aruva also contends that Fowler refused to perform projects in the main "HALO" system that her team used because they were "too complicated." *Id.* at 495. In response, Aruva placed Fowler on a remedial action plan for job training and started assigning her "small projects" on different systems called "ABM" and "ND360." *Id.* Fowler subsequently requested accommodations for longer deadlines because her medical conditions caused her to have memory and focus issues that made it difficult for her to learn new aspects of the job. AT&T, through an outsourced service center, went back-and-forth with Fowler's doctors on the accommodation requests for approximately two and a half months. The representatives found that Fowler "could not describe a specific accommodation that would help her on the job." *Id.* at 231. Hence no job accommodation, other than granting extra time to perform work, was made.

In October 2016, AT&T again placed Fowler on surplus status. This time, she was the only one from her unit laid off. *Id.* at 2438. She alleges that this was by design, suggesting that the evidence tends to show that some AT&T managers pre-selected her as a "target" for termination prior to implementing the surplus procedures (and thus against internal AT&T policy). During the surplus period, Fowler could not find any replacement positions within AT&T and thus was terminated on December 27, 2016. She was sixty years old.

After her termination, Fowler exhausted her administrative remedies with the Equal Employment Opportunity Commission (EEOC) and then sued AT&T in the District of New Jersey. She brought claims for age and disability discrimination (disparate treatment) under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et*

8

*seq.*, and Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, as well as the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. §§ 10:5-1, *et seq*. She also brought claims for failure to accommodate her disabilities and a hostile work environment.[1]

The District Court granted summary judgment for AT&T on all claims. Fowler now appeals.[2]

**II. Discussion**

Fowler, as noted, brings claims under both the ADA and the ADEA. Because claims under these statutes align with claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, we look to Title VII case law to help inform our analysis. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995); *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999). Similarly, New Jersey law generally tracks the relevant federal statutes, and neither party points to any divergent aspect of New Jersey law that would not follow the outcome in this case. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 n.14 (3d Cir. 2017) (observing that "[t]he requirements for failure to accommodate claims under New Jersey's LAD have been interpreted in accordance with the [ADA]" (alterations in original) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246

---

[1] Fowler lost on the hostile work environment claim and does not press it on appeal, so we do not discuss it further.

[2] The District Court had jurisdiction over the federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

n.12 (3d Cir. 2006)); *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996) ("Age discrimination claims under the ADEA and LAD are governed by the same standards and allocation of burdens of proof."); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1212 (3d Cir. 1995) ("New Jersey courts in applying the NJLAD generally follow the standards of proof applicable under the federal discrimination statutes . . . .").

We analyze these claims under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barber*, 68 F.3d at 698 (as to ADEA); *Walton*, 168 F.3d at 668–69 (as to ADA). To survive summary judgment, Fowler must present a claim that on first sight has enough merit to proceed (called a *prima facie* case). *See Walton*, 168 F.3d at 668. ADA and ADEA claims differ only slightly in the elements needed to show a *prima facie* case of discrimination. Essentially, Fowler must show that she was (1) disabled (for the ADA claim) or over the age of 40 (for the ADEA claim), (2) subject to an adverse employment action, (3) qualified for her position, and that (4) the adverse employment action was because of her disability (ADA) or her age (ADEA). *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 414 (3d Cir. 2017) (ADA); *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (ADEA).[3] In cases involving

---

[3] In ADA (but not ADEA) cases, we tend to truncate this into a three-prong test by combining prongs 2 and 4 into a single prong asking whether the employee "has suffered an adverse employment action because of that disability." *See, e.g.*, *McNelis*, 867 F.3d at 414. For clarity and efficiency, we present both tests in the four-prong framework, following the briefing by both parties. This presentation is purely for convenience and does not alter the substantive elements of the

a reduction-in-force, the last prong of an age discrimination case may be satisfied by showing that an employer retained a sufficiently younger, similarly situated employee. *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249–50 (3d Cir. 2002).

If Fowler is able to make out a *prima facie* case, the burden of production shifts to AT&T to provide a legitimate, non-discriminatory reason for its actions. *Walton*, 168 F.3d at 668. If it does, Fowler may prevail at summary judgment only if she has evidence that AT&T's response is merely a pretext, meaning evidence that could cause a jury "either [to] (1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 66 (3d Cir. 1996*)*).

Our review on appeal is plenary, which means we review each element anew. *See McNelis*, 867 F.3d at 414. We view the facts and reasonable inferences "in the light most favorable" to Fowler, though recognizing that "mere allegations are insufficient," and "[o]nly evidence sufficient to convince a reasonable factfinder" merits consideration at this stage. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (alteration in original) (quoting *Lauren W. v. DeFlaminis*, 480 F.3d 259, 255 (3d Cir. 2007)). "In essence," the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

claims required by our precedents. *Cf. Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356–57 (3d Cir. 1999) (discussing the "fourth element of the prima facie case" for both "cases brought under the [ADA] and the [ADEA]").

one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

**A. Fowler's Discrimination Claims Stemming from the January Surplus Fail.**

For the January surplus, the only disputed issues are whether Fowler suffered an adverse employment action and whether she has sufficiently shown discrimination and pretext. While we hold that the January surplus selection was an adverse employment action, we conclude that, even assuming Fowler has shown a *prima facie* case of discrimination, she cannot show pretext, meaning that none of her claims associated with the January surplus selection survive summary judgment.

*1. The January surplus selection is an adverse employment action.*

The District Court concluded that the January surplus was not an adverse employment action because Fowler ultimately maintained her employment with AT&T. Supported by the EEOC, she disagrees, as do we.

Fowler's discrimination claims accrued when she received notification of her January surplus status. *See Watson v. Eastman Kodak Co.*, 235 F.3d 851, 853, 855, 857 (3d Cir. 2000) (holding that the statute of limitations begins to run at the time an employee is notified of an impending termination, even if her notification of termination "left open the possibility of [her] continued employment with the company" if she was "successful in obtaining another position within [it]"); s*ee also Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (concluding,

12

in the context of a denial of tenure that was communicated well before the eventual loss of employment, "the only alleged discrimination occurred . . . at the time the tenure decision was made and communicated. . . . even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position— did not occur until later") (emphasis in original).

Before now, we have not considered whether a notice as we have here is an "adverse employment action" sufficient to satisfy a *prima facie* case, but it is a small and logical step to so hold based on our statute-of-limitations case law. Reaching the opposite conclusion—that a *prima facie* case may only be satisfied after an employee actually loses her job—could produce an absurd result where a plaintiff's limitations period expires before she was actually terminated, and thus before her substantive claim even accrues.[4]

Fortunately, the relevant statutes preclude this illogical outcome because their text comfortably covers surplus selections like Fowler's. Even were her selection not a discharge *per se*, discrimination is prohibited more broadly in

---

[4] This would not be the only incongruous result. Such a conclusion would perversely place the burden on plaintiffs to work hard to seek other jobs to mitigate the consequences of a potentially discriminatory surplus selection. It would also protect employers from suit in even the most egregious cases of discriminatory surplus selection if the employee was lucky enough to secure a position elsewhere in the company. This could reward "not-in-my-backyard" discrimination where bosses would be free to keep their divisions free of diversity as long as they ensured that any protected individuals they pushed out would get a job in a different division of the company.

the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); 29 U.S.C. § 623(a)(1). Fowler's selection for surplus status altered the terms and conditions of her employment; as soon as she received notice of it, her employment became conditional. Absent mitigating action by Fowler, *e.g.*, finding another job, or unexpected developments that could cause AT&T to reverse course, she would be terminated at a set future date. After AT&T's January notices went out, the employees who were selected for surplus were in a materially different position than those who were not, despite both groups continuing in the short term to work for AT&T. That an employee is able to find a new job does not mean that her initial surplus selection was not an adverse employment action; it means merely that the employee was able to lessen the adversity—and potentially the damages—of the employer's action.

Our thinking accords with that of every other circuit court to consider the issue. *See Singletary v. Howard Univ.*, 939 F.3d 287, 300 (D.C. Cir. 2019) (concluding that "the mere notice of termination is a cognizable adverse employment action regardless of whether the employer follows through"); *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 305–06 (2d Cir. 2017) (holding that "notice of termination itself constitutes an adverse employment action, even when the employer later rescinds the termination"); *see also Almond v. Unified Sch. Dist.*, 665 F.3d 1174, 1177 (10th Cir. 2011) (noting, though in a *dictum*, that "adverse employment actions can involve entirely deferred consequences— such as . . . a notice of termination with a grace period before actual firing occurs").

Today we hold that a notice of termination, like the selection for surplus status here, is an adverse employment action even if an employee is given a window of time—small or large—before her actual discharge. Such a notice is adverse without regard to whether the employee is permitted to apply for other positions within the company, or even if she ultimately succeeds in finding another position.[5]

> 2. *Fowler has not provided sufficient evidence that AT&T's facially neutral surplus selection was merely pretext for discrimination.*

Fowler argues that she has met her burden to show a *prima facie* case of discrimination because she has identified three younger, non-disabled employees with similar historical performance ratings who were retained in the January surplus. *See Anderson*, 297 F.3d at 250 (holding that "to present a *prima*

---

[5] We recognize that panels of our Court have declined in non-precedential opinions to conclude lateral job transfers are actionable adverse employment actions when those transfers do not result in a loss of pay, benefits, status, or advancement opportunities. *See, e.g.*, *Stewart v. Union Cnty. Bd. Of Educ.*, 655 F. App'x 151, 157 (3d Cir. 2016); *Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012); *Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2006). Fowler, in contrast, did not experience a lateral transfer. When AT&T placed Fowler on surplus status, the terms and conditions of her employment materially changed. Fowler faced an impending termination date and avoided discharge only because she applied for and received a completely different job.

*facie* case raising an inference of age discrimination in a reduction in force situation, the plaintiff must show, as part of the fourth element [i.e., the causal link to discrimination], that the employer retained someone similarly situated to him who was sufficiently younger"). We assume, for the sake of argument, that these employees sufficiently serve as comparators in the age-discrimination context. And we also assume, without deciding, that identifying these non-disabled individuals as similarly situated retained employees is sufficient to satisfy the fourth prong of her *prima facie* ADA case. But even had she made out a *prima facie* case, Fowler has not provided evidence to infer that AT&T's neutral reason for her surplus selection was merely pretextual.

AT&T presents powerful information that supports its claim that Fowler's termination was simply the product of a neutral selection of employees for a reduction in force. First, it stresses that her termination occurred during a planned company-wide downsizing that led to eliminating over two hundred positions. Within Fowler's work group, AT&T planned to place seventeen employees on surplus status, out of a total of fifty-five employees—reducing the group's headcount by nearly one-third. Her selection for the surplus was the product of ranking employees based on their performance rating (with the exception of some employees who volunteered for surplus). In internal emails and notes around the time of Fowler's surplus selection, her manager reiterated to colleagues that Fowler "is a very strong and capable employee, [but] unfortunately so is the rest of the organization and overall this is where she ranked." App. at 477. And Fowler's manager's contemporaneous notes indicate that she "worked with [Fowler's] former supervisor and reviewed with [her] own supervisor her rating to assure it was

16

appropriate." *Id*. at 479. Yet Fowler had the sixth lowest rating in her group, placing her squarely within the seventeen employees they planned to terminate. And seven of the employees who were rated and ranked against Fowler and ultimately retained were her age or older. This is particularly persuasive, as it would be odd to terminate Fowler because of her age but then retain other employees who were older.

In response, Fowler argues that AT&T's neutral reduction-in-force story was merely a pretext for discriminatory surplus selection. But we are not persuaded that any of Fowler's arguments could convince a reasonable juror to "disbelieve [AT&T's] articulated legitimate reasons" or that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Walton*, 168 F.3d at 668 (internal quotation marks omitted). We accept as true for purposes of summary judgment that she was a competent employee who historically received satisfactory ratings. But "the essence of a [reduction in force] is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired." *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988).

Further, it is not unexpected that after a layoff some job responsibilities that were formerly held by the terminated employees would be shifted to remaining employees. This does not, by itself, demonstrate pretext, especially here where AT&T contends that the employees who assumed some of these responsibilities were themselves similar in age to Fowler. *See* App. at 6–7, Dist. Ct. Op. at 4 (noting AT&T's explanation that Fowler's job responsibilities were assumed by employees who were 49, 55, and 57 years old, but declining to recognize

17

a factual dispute as to whether another person took over her position entirely because "she provides no evidence" of that proposition). And though we know no reason to dispute her general assertion, supported by expert testimony,[6] that some ostensibly neutral ratings systems may be inherently subjective and can sometimes reflect discriminatory bias, *see Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 321 (3d Cir. 2000), or that AT&T's process could be better, Fowler has simply not provided evidence here sufficient for a jury to conclude that her particular ratings were pretext for discriminatory bias.[7]

Fowler's best argument is that she was the only disabled person selected for surplus, but she has not identified any evidence of pretext other than that her supervisor could not

---

[6] AT&T argues that this report would not be admissible under Rule 702 because it is not sufficiently reliable. We need not digress to consider its admissibility because the report fails to alter our decision even if it is reliable and admissible. *See, e.g.*, App. at 695, Caren Goldberg, Ph.D., Dep. Tr., at 228:3–8 (making clear that she "was not" asked and "didn't" offer "any opinions in this case as to whether or not the decisions affecting Ms. Fowler were based on stereotypes or discrimination"); *id.* at 708, Caren Goldberg, Ph.D., Dep. Tr., at 315:2–10 (declining to express any opinion on whether "the process used by AT&T to evaluate people's leadership in any way led to bias on the basis of age").

[7] We are confident that no reasonable juror would view the very general statements made by AT&T senior management about how the company has an aging workforce and the need to reinvent the company as evidence of pretext in Fowler's case.

remember at her deposition, after three years had passed, the specific reasons for the surplus ratings she gave Fowler—meaning they *could* have been due to her disability. While this may be enough to state a *prima facie* case of disability discrimination, it is not enough for a reasonable jury to believe that AT&T's ratings were pretextual. *Cf. Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 340–41 (3d Cir. 1995) (Roth, J., dissenting) ("'While plaintiff is entitled to every favorable inference,' he is not entitled to build a case on 'the gossamer threads of whimsy, speculation and conjecture.'" (quoting *Keller v. Bluemle*, 571 F. Supp. 364, 371 (E.D. Pa. 1983), *aff'd*, 735 F.2d 1349 (3d Cir. 1984)). And while her supervisor, again three years later, was unable to recall why Fowler's ratings were lower than several colleagues who had historically received similar performance ratings as her, it bears noting that even if she were rated higher than ten more employees, she still would have been laid off. And the reasons that her supervisor did recall years later for not rating Fowler's performance higher—that she was neither deficient nor exceeded expectations, but rather "[s]he did what she was supposed to do"—do not provide evidence of pretext. App. at 451. To the contrary, they are consistent with Fowler's ranking in the surplus: not at the very bottom, but not above average. Thus we conclude Fowler has not shown pretext sufficient to survive summary judgment for any of her claims tied to the January surplus.

### B. Fowler's Discrimination Claims Stemming from the October Surplus Fail at Summary Judgment Because She Was Not Qualified for Her Position.

To maintain either an age or disability discrimination claim, Fowler must show that she was qualified for her

19

position: she must have "the requisite skill, experience, education, and other job-related requirements of the position." *See Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006). The ADA claim further requires Fowler to show that, "with or without reasonable accommodation, [she] can perform the essential functions of that position." *Id.* At the *prima facie* stage, this requires an inquiry into whether she possessed the minimal objective qualifications for the position. *See Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 64–65 (3d Cir. 1989) (choosing to consider only objective qualifications at the *prima facie* stage, while declining to establish any "blanket rule" about when more subjective qualification criteria can enter the analysis in particular cases); *Makky v. Chertoff*, 541 F.3d 205, 215–16 (3d Cir. 2008) (concluding, in the "narrow" context of a mixed-motive employment discrimination case resolved at a motion to dismiss, that the qualification inquiry is limited to "the bare minimum requirement necessary to perform the job" and that plaintiffs need not show "that they were subjectively qualified for their jobs, i.e., performed their jobs well").

Fowler's case is unusual in that her argument that she was objectively qualified for her new position is belied by her own contemporaneous statements as well as those she made in her deposition. *See* App. at 1030, 1034; *id.* at 174, Fowler Dep. Tr., at 176:12–13 ("I did not have the skill set for that position"); *id.* at 198, Fowler Dep. Tr., at 243:7 ("I didn't fit the position"); *id.*, Fowler Dep. Tr., at 243:8–11 (agreeing that she "w[as]n't qualified for the position" because of "the skill set required"). While we certainly do not expect employees to be experts in the nuances of employment discrimination law or to use the legal definition of "qualified" in their everyday statements, *see Kengerski v. Harper*, 6 F.4th 531, 540 (3d Cir.

2021), the only logical conclusion is that Fowler was using the term "qualified" according to its ordinary meaning: she simply did not have the minimum skills necessary to perform the job. *See* App. at 1030, Email from Fowler to Srinivasa Marella (describing the job as "not a skills match for [her]"); App. at 1034, Email from Fowler to Madhavi Aruva (Fowler explaining that she was "not suited or qualified for [the] position"). Any doubt about what Fowler meant is resolved by her clarifications that she lacked recent experience in a technical position. *See* App. at 1030, E-mail from Fowler to Srinivasa Marella (noting that her "experience in technical work was 13+ years ago and at [a different] level of detail"). Therefore, we view Fowler's multiple statements in the record as directly contradictory to her arguments before the District Court and on appeal that she is sufficiently qualified for her job to bring an ADA or ADEA claim.

When a plaintiff makes sworn statements that squarely concede her lack of qualifications, she faces a higher burden to make out a *prima facie* case and survive summary judgment: she must offer an explanation for the apparent contradiction. *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999); *see also id.* at 807 ("[T]he court should *require* an explanation of any apparent inconsistency with the necessary elements of an ADA claim.") (emphasis added). Much of our case law on this point comes in the context of judicial estoppel stemming from statements made in previous proceedings before a court or agency or in sworn statements. *See Detz v. Greiner Indus., Inc.,* 346 F.3d 109, 117–18 (3d Cir. 2003) ("We have similarly applied *Cleveland* . . . where, as here, the claimant clearly made a contradictory assertion after benefitting from a previous sworn assertion, the court or agency thus having accepted the previous assertion."); *see also*

*Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) ("When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists."). While many of Fowler's statements were made in informal emails to her supervisors rather than in sworn statements or prior judicial proceedings, she repeated the substance of these statements in sworn testimony at her deposition in this case. *See* App. at 174, 198.

And even if Fowler's concessions do not "automatically estop [her] from pursuing an ADA claim" in a formal sense, *Cleveland*, 526 U.S. at 797, they are nonetheless relevant to our inquiry at summary judgment. The essence of our task here is to determine whether there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Where Fowler herself has conceded her lack of qualifications, *post-hoc* assertions by her lawyers during litigation that she was in fact qualified, without more, are not enough to create a genuine dispute of material fact that stops summary judgment. Courts "cannot simply ignore the apparent contradiction . . . . Rather, [Fowler] must proffer a sufficient explanation." *Cleveland*, 526 U.S. at 806. It must "warrant a reasonable juror's concluding that, assuming the truth of, or [her] good-faith belief in, the earlier statement, [she] could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* at 807; *see also Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 320–21 (3d Cir. 2005) (concluding that an "absence of evidence, coupled with the concession of West Penn's General Counsel[,] . . . compels the conclusion that a reasonable jury could not [find in favor of West Penn]").

Here, Fowler has not offered any such explanation that is plausible enough to require consideration on a remand. On appeal, her primary explanation is that her earlier contradictory statements were made in the context of a request for accommodations. But this explanation is not supported by the record. We recognize that Fowler separately made explicit requests for various accommodations from AT&T, citing her disabilities. But accommodation requests alone do not conflict with her statements that she did not possess the minimum qualifications for the position. We look at the context in which those specific concessions were made to probe whether she can sufficiently explain the inconsistency. The reason Fowler provided for being unable to perform her new job was not her disabilities, but rather the "13+ years" since her last technical position that was "at [a different] level of detail." App. at 1030. The email in which she stated she was not qualified did not mention her disabilities at all, let alone request any accommodations other than being reassigned to a completely different position. *Id*. at 1034. And though an earlier email mentioned her breast cancer treatments, it did not imply that they were the reason for her inability to do the job; rather, Fowler mentioned her medical condition to explain why she could not bear the stress of remaining in a job that "is not a skills match." *Id.* at 1030.

Fowler also stresses that her supervisor, Madhavi Aruva, viewed her as qualified. *See* Fowler's Reply Br. at 8–12. In the ordinary case, we would expect a district court to consider this evidence more thoroughly than the Court did here, especially where this assessment was based on a review of Fowler's "experience[,] . . . technical skills[,] . . . communication skills[,] . . . and education background." App. at 1422; *see also id*. at 1419, 1436 (noting that Aruva reviewed

Fowler's resume and chose her over other candidates because of her experience as "a system engineer . . . working on local and long distance," which was "related" to what her team supports).

Still, we ultimately agree with the District Court that a hiring official's initial determination that an applicant is qualified "does not and cannot end the inquiry." App. at 16. While evidence of a supervisor's assessment of an employee's qualifications and performance is relevant and may even be sufficient to state a *prima facie* case and survive summary judgment in some contexts, the rest of the record here shows that this evidence is not probative. Fowler conceded that the criteria used during hiring were not consistent with the skills actually required by the job, *id*. at 1926–27; thus we must look to the statements Fowler made after starting the new position to identify whether she was objectively qualified.

Contrary to her assertions, Fowler's Reply Br. at 9, we are not improperly weighing conflicting evidence to resolve a factual dispute against her. For the purposes of summary judgment, we view Aruva's testimony and corresponding record evidence, *see, e.g.*, App. at 1672–74, 1900-01, in the light most favorable to Fowler. But we still must determine whether she has given a sufficient explanation for her earlier statements that would allow us to conclude there is a genuine dispute on this point. The fact that Aruva believed (perhaps mistakenly) that Fowler was qualified at the time she hired her does not explain away Fowler's concessions that she was, in fact, not qualified for the position. To the contrary, Fowler herself explained how Aruva's testimony was consistent with her own admissions: she stated simply and explicitly that "whoever reviewed [her resume]" did an inadequate job and

"should have . . . caught" the fact that it did not align with the position. *Id*. at 1926–27.

Nor are we persuaded by Fowler's claim that she was able to improve her job performance over time such that she eventually became qualified for her position. To be sure, "[t]he determination of whether an individual with a disability is qualified is made at the time of the employment decision . . . ." *Turner*, 440 F.3d at 611. But the record does not support Fowler's assertion that her inability to do the job had changed by the time she was terminated. Any reasonable juror reading through the evidence she cites would be forced to conclude that Fowler's reading is a misrepresentation. It is true Aruva conceded that Fowler had been satisfactorily performing the projects she had been given "with little help" at the time of her termination, but Fowler's quote omits important context about those projects. App. at 1472. They were "small tasks" Aruva had assigned just to keep Fowler busy until she had completed remedial training. App. at 495. By contrast, the "HALO" projects—which typically made up ninety to one-hundred percent of the work for Aruva's engineers—were continually refused by Fowler, who stated they were too complicated for her to perform. App. at 495–496. And her improvement on those small tasks, Aruva clarified, was only an improvement from "10 percent output to at least 25 percent output." App. at 1444.

In short, we do not believe that the evidence and explanations that Fowler has submitted are "sufficient to warrant a reasonable juror's concluding" that she was qualified for her position. *Cleveland*, 526 U.S. at 807. The District Court was thus correct to grant summary judgment in favor of

AT&T on all claims stemming from her later surplus selection and eventual termination.[8]

### C. Fowler's Failure-To-Accommodate Claims Also Fail at Summary Judgment.

As Fowler recognizes, there is significant "interplay between the two theories of ADA liability" that she advances: discrimination in the October surplus selection and a failure to

---

[8] Concerning, however, is some of the evidence Fowler provided to show that AT&T acted in a discriminatory manner and that its purportedly neutral surplus selection story was mere pretext. *Compare* App. at 667–668 (deposition testimony confirming that Fowler was designated as a "target employee" for surplus before employees were ranked and rated") and App. at 2440 (email correspondence that could plausibly be read as engineering a bogus layoff process around Fowler), *with* App. at 1513–1514 (HR testimony that targeting procedures were inconsistent with AT&T's policies), App. at 276 (AT&T's internal documents making clear that surplus is not a "performance management tool" to fire low-performing employees), and App. at 1544 (testimony that an HR employee "would have slapped" a colleague if she knew he wanted to target particular employees like Fowler for surplus). But because we hold that Fowler was not qualified for this position, her claims necessarily fail. Thus we do not analyze discrimination and pretext any further. However, in future cases involving qualified employees, "disturbing procedural irregularities" like these may well preclude summary judgment. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).

accommodate her disabilities while she was a senior systems engineer. Fowler's Br. at 37. Indeed, a claim stemming from an employer's failure to accommodate an employee's disabilities may be viewed simply as a type of discrimination claim, where the relevant adverse employment action is the employer's "refus[al] to make reasonable accommodations for a[n employee's] disabilities." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (quoting *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)). An employee can only show that her employer "breached its duty to provide reasonable accommodations" if she "could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (quoting *Williams*, 380 F.3d at 772). Therefore, "the plaintiff bears the burden of proving that she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation that would render her otherwise qualified exists." *Walton*, 168 F.3d at 670.

For substantially the same reasons as Section II.B, *supra*, we conclude that Fowler has not met her burden to show that she is otherwise qualified for her position. By her own admissions, her inability to perform the job functions were because she lacked the basic skills and experience for the position. She has not pointed to any reasonable accommodations that could plausibly make up for the highly technical skills she concedes she lacks. Thus she cannot maintain a failure-to-accommodate claim.[9]

---

[9] In some circumstances, "an employer may be required to transfer an employee to an existing position" as a form of accommodation. *Donahue v. Consol. Rail Corp.*, 224 F.3d

* * * * *

We are sympathetic to Fowler's situation. But while it is deeply unfortunate for a sixty-year-old cancer patient to lose her job, it is not necessarily a violation of employment discrimination laws. Those laws do not prohibit employers from terminating employees in protected classes when the termination is a part of a neutral reduction in force. And employers are not required to retain or accommodate employees who are not qualified for their jobs and could not perform them even with reasonable accommodations. When AT&T placed Fowler on surplus status in January 2016, she suffered an adverse employment action. But, her surplus selection was then a neutral reduction in force at AT&T, and Fowler has failed to provide sufficient evidence to show that

---

226, 230 (3d Cir. 2000) (explaining the elements of a failure-to-transfer theory). Yet Fowler has not shown that she made AT&T aware, as part of the interactive process, that she wanted a job transfer to accommodate her disabilities. Instead, her requests to supervisors to change positions are best read as reflecting her lack of qualifications for that position rather than as requests for a disability accommodation. *See, e.g.*, App. at 1034. And, in any event, while Fowler points to two vacant positions, Fowler's Br. at 57, she has failed on appeal to point to any evidence showing that she would be "qualified to perform the essential duties of [those] job[s] with reasonable accommodation," *Donahue*, 224 F.3d at 230, other than a reference to her own attestations that she believed she was qualified. *See* Fowler's Br. at 57 (citing App. at 1080–81). Therefore, on this record and briefing, we conclude that she cannot save her failure-to-accommodate claims under a failure-to-transfer theory.

28

its neutral process was mere pretext for age or disability discrimination.  Attempting to assure she had a job, Fowler sought and accepted a position elsewhere at AT&T.  But, by her own admission, she was not qualified for her new position.  Accordingly, we conclude that none of Fowler's claims can survive summary judgment and affirm the judgment of the District Court.